1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney
2
   MARTHA A. BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  COLIN SAMPSON (CABN 249784)
   Assistant United States Attorney
5
       450 Golden Gate Avenue, 11th Floor
6      San Francisco, California 94102-3495
       Telephone: (415) 436-7020
7      Fax: (415) 436-7009
       Email: Colin.Sampson@usdoj.gov
8
   Attorneys for United States of America
9

10                 IN THE UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                          OAKLAND DIVISION

13

14  IN THE MATTER OF THE EXTRADITION OF: )   **No. 4:24-mj-70178-KAW**
                                          )
15  DIEGO MARADONA HAVAL SAED             )   **MEMORANDUM IN SUPPORT OF REQUEST**
                                          )   **FOR DETENTION PENDING EXTRADITION**
16                                        )   **PROCEEDINGS**
                                          )
17  _____   )

18

19

20

21

22

23

24

25

26

27

28

NON-DISCLOSURE ORDER

# TABLE OF CONTENTS

I.     BACKGROUND AND CHARGES IN CANADA ........................................................1

II.    SAED SHOULD BE DETAINED ........................................................................3

    A.     Applicable law ..................................................................................4

        1.     A strong presumption against bail governs in an international
            extradition proceeding ................................................................4

        2.     Fugitives must be detained unless they establish "special
            circumstances" and also demonstrate that they are neither a flight risk
            nor a danger to the community ...................................................5

    B.     Analysis.............................................................................................7

        1.     Saed is a Clear Flight Risk .........................................................7

        2.     Saed is a Danger to the Community .............................................9

III.   CONCLUSION ...............................................................................................10

1

## **TABLE OF ATHORITIES**

2

Page(s)

3

Cases

4

5
*In re Extradition of Adame,*
   2013 WL 1222115 (S.D. Tex. Mar. 25, 2013)..................................................................... 8

6
*In re Extradition of Antonowitz,*
   244 F. Supp.3d 1066 (C.D. Cal. 2017) ......................................................................... 5, 7

7
*In re Extradition of Beresford-Redman,*
   753 F. Supp.2d 1078 (C.D. Cal. 2010) ............................................................................. 6

8
*In re Extradition of Garcia,*
   615 F. Supp. 2d 162 (S.D.N.Y. 2009)............................................................................... 5

9
*In re Extradition of Heilbronn,*
   773 F. Supp. 1576 (W.D. Mich. 1991) ............................................................................ 7

10
*In re Extradition of Kin-Hong,*
   913 F. Supp. 50 (D. Mass. 1996) ..................................................................................... 6

11
*In re Extradition of Kirby,*
   106 F.3d ........................................................................................................................... 5

12
*In re Extradition of Kyung Joon Kim,*
   2004 WL 5782517 (C.D. Cal. July 1, 2004)..................................................................... 7

13
*In re Extradition of Mainero,*
   950 F.Supp. 290 (S.D. Cal. 1996)................................................................................. 5, 6

14
*In re Extradition of Martinelli Berrocal,*
   263 F. Supp.3d 1280 (S.D. Fla. 2017) .................................................................... 4, 5, 6, 7

15
*In re Extradition of Noeller,*
   2017 WL 6462358 (N.D. Ill. Dec. 19, 2017) ............................................................... 6, 7

16
*In re Extradition of Orozco,*
   268 F. Supp.2d 1115 (D. Ariz. 2003) .............................................................................. 7

17
*In re Extradition of Pelletier,*
   2009 WL 3837660 (S.D. Fla. Nov. 16, 2009)................................................................... 7

18
*In re Extradition of Perez-Cueva,*
   2016 WL 884877 (C.D. Cal. Mar. 7, 2016) ..................................................................... 6

19
*In re Extradition of Rovelli,*
   977 F. Supp. 566 (D. Conn. 1997)................................................................................... 7

20
*In re Extradition of Shaw,*
   No. 14–MC–81475, 2015 WL 521183 (S.D. Fla. Feb. 6, 2015) ...................................... 8

21
*In re Extradition of Sidali,*
   868 F. Supp. 656 (D.N.J. 1994)....................................................................................... 6

22
*In re Extradition of Siegmund,*
   887 F. Supp. 1383 (D. Nev. 1995) .............................................................................. 6, 7

23
*In re Extradition of Smyth,*
   976 F.2d 1535 (9th Cir. 1992) ......................................................................................... 6

24
*In re Mitchell,*
   171 F. 289 (S.D.N.Y. 1909)............................................................................................. 4

25
*Jhirad v. Ferrandina,*
   536 F.2d 478 (2d Cir. 1976)............................................................................................. 8

26

27

28

*Prasoprat v. Benov,*
    421 F.3d 1009 (9th Cir. 2005) ................................................................................................ 5
*Salerno v. United States,*
    878 F.2d 317 (9th Cir. 1989) ........................................................................................... 4, 6, 7
*United States v. Botero,*
    604 F. Supp. 1028 (S.D. Fla. 1985) ....................................................................................... 7
*United States v. Leitner,*
    784 F.2d 159 (2d Cir. 1986).......................................................................................... 4, 5, 6, 7

Statutes

18 U.S.C. § 3156 ............................................................................................................................. 3
18 U.S.C. § 3141 ......................................................................................................................... 3, 5
18 U.S.C. § 3141(a) ........................................................................................................................ 3
18 U.S.C. § 3181 ............................................................................................................................. 3

Rules

Fed. R. Crim. P. 1(a)(5)(A) ............................................................................................................ 5

Based on the nature of the Canadian charges against Mr. Saed, including trafficking fentanyl, the presumption against bail in extradition proceedings, and Mr. Saed's lack of ties to this community, the Court should detain Mr. Saed pending the extradition hearing.

## I.     BACKGROUND AND CHARGES IN CANADA

On February 2, 2024, Mr. Saed was arrested in the Northen District of California pursuant to a Complaint and Arrest Warrant.  Canada requested Mr. Saed's provisional arrest with a view towards extradition pursuant to its extradition treaty with the United States ("the Treaty").[1]  Canada seeks Mr. Saed's extradition for prosecution for one count of trafficking a controlled substance, contrary to section 5(1) of the Controlled Drugs and Substances Act, S.C. 1996, c. 19 ("CDSA"), and three counts of possession for the purposes of trafficking a controlled substance, contrary to section 5(2) of the CDSA.[2]

Canadian authorities seek Mr. Saed's provisional arrest based on their assertions that :

a) Evidence collected from lawfully authorized police searches of drug stash sites (e.g., apartment units) in Vancouver, Canada, in combination with police surveillance, building CCTV footage, lawfully intercepted communications, and expert evidence, showed Mr. Saed[3] trafficking controlled substances from approximately December 2020 through approximately May 2021 in British Columbia, Canada, while working in within a nationwide criminal organization known formerly known as the "Wolf Pack" before the shooting death of its leader in January 2021;

---

[1] Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, *as amended by* Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. Treaty Doc. No. 101-17 (1990); and Second Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. Treaty Doc. No. 107-11 (2002) (collectively, the "Treaty").

[2] The United States sought a warrant for Mr. Saed's provisional arrest based only on these four charges.  Canada requested Mr. Saed's provisional arrest on additional charges, and the United States' decision to proceed in urgent circumstances on these select charges is without prejudice to proceeding on additional charges when Canada's formal request for extradition is submitted to the United States.

[3] Another relative of Mr. Saed is alleged to be involved in Wolf Pack drug trafficking organization, however, all references to Mr. Saed relate to the arrestee, Diego Maradona Haval Saed.

b) A police search of a drug stash site located on Seymour Street, Vancouver, Alberni Street, Vancouver (also known as "Shangri-La"), Hornby Street, Vancouver, and other stash sites in December 2020 and May 2021 revealed kilogram-level quantities of Schedule I drugs (*i.e.*, fentanyl, carfentanil, methamphetamine, and cocaine), cash, and drug processing and trafficking paraphernalia (*e.g.*, digital scale, Ziploc-style baggies, and cash counter machine).

  i. At the Seymour Street location, investigators found a food dehydrator with a tray containing one kilogram of purple fentanyl, as well as purple food coloring, a digital scale, and Ziploc bags, a cash counter, and a bundle containing approximately $45,000 CAD;

  ii. At Shangri-La, investigators found a bundle of cash of approximately $7,000 CAD, a cash counter, and drug score sheets;

  iii. At the Hornby Street location, investigators found 2.75 kilograms of fentanyl, 3.3 kilograms of crystal methamphetamine, and 400 grams of cocaine, and a digital scale;

c) When he was arrested on May 31, 2021, Mr. Saed possessed a key fob for Shangri-La;

d) Evidence from police surveillance, building CCTV footage and intercepted communications revealed that Mr. Saed had access to the three drug stash sites listed above, and others, and attended them regularly.  The same evidence showed Mr. Saed carrying bags into and out of each of the named stash sites, and conducting short-duration meetings and bag exchanges with third parties in private locations, consistent with drug trafficking;

e) Evidence from audio and video probes inside the Seymour and Alberni Street stash sites revealed Mr. Saed and other members of the drug trafficking organization having

conversations with others relating to the drug operation.  Evidence from the video probe inside the Seymour Street stash site showed members of the drug trafficking organization working together, in furtherance of the drug operation.  Mr. Saed was captured on video handling cash and filling small Ziploc-style bags of white powder, including retrieving one bag of white substance from inside his pants;

 f) A Canadian law enforcement drug expert concluded that the stash sites were used to prepare Schedule I drugs for the purpose of drug trafficking at the distribution and wholesale level;

 g) On May 31, 2021, the day Mr. Saed was arrested, police seized from the Seymour Street location a .223 caliber semi-automatic assault rifle and a loaded 30-round magazine; and

 h) On June 2, 2023, Justice Kathleen M. Ker of the Supreme Court of the Province of British Columbia, Canada, issued a warrant for Saed's arrest.

On February 1, 2024, the United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Mr. Saed's arrest.  This Court issued the arrest warrant, and Mr. Saed was arrested on February 2, 2024, and made his initial appearance before the Court on February 5, 2024.  Mr. Saed is currently detained pending a decision on bail at or after the hearing scheduled for February 22, 2024.

## II. SAED SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*.  The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, does not provide for bail.  Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[4]  *See*

---

[4] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts.  *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).  Here, Mr. Saed is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses committed in violation of the law of the requesting state, Canada.

NON-DISCLOSURE ORDER  3

1  *Kamrin*, 725 F.2d at 1228 full citations needed; *Martin*, 993 F.2d at 828.  Rather, case law provides that

2  bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when

3  the requirements of justice are absolutely peremptory."  *United States v. Leitner*, 784 F.2d 159, 160 (2d

4  Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

5      The government notes at the outset that, although the government has requested detention and

6  filed its brief first, it does not have the burden with respect to detention.  For the reasons stated below,

7

8  the Court should deny bail pending the outcome of the extradition proceedings, which should be

9  conducted without delay.

10     **A.    Applicable law**

11     1.    <u>A strong presumption against bail governs in an international extradition proceeding</u>

12

13     Unlike in domestic criminal cases, "[t]here is a presumption against bail in an extradition case."

14  *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989); *see also Martin*, 993 F.2d at 827; *In re*

15  *Extradition of Martinelli Berrocal*, 263 F. Supp.3d 1280, 1294 (S.D. Fla. 2017) ("[A]ny release of a

16  detainee awaiting extradition is largely antithetical to the entire process.").  The Supreme Court

17  established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign

18  government makes a proper request pursuant to a valid extradition treaty, the United States is obligated

19

20  to deliver the person sought after he or she is apprehended:

21          The demanding government, when it has done all that the treaty and the law

22          require it to do, is entitled to the delivery of the accused on the issue of the proper
           warrant, and the other government is under obligation to make the surrender; an

23          obligation which it might be impossible to fulfill if release on bail were permitted.
           The enforcement of the bond, if forfeited, would hardly meet the international

24          demand; and the regaining of the custody of the accused obviously would be
           surrounded with serious embarrassment.

25

26  190 U.S. at 62.

27     The prudential reasons for this presumption against bail in international extradition cases are

28  clear and compelling.  When, as here, a requesting country meets the conditions of the Treaty, the

United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62.[5] It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp.3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.")

Moreover, the Federal Rules of Criminal Procedure and the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, do not apply to extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive"); *Mathison*, 974 F. Supp. 2d at 1304. A fugitive generally has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005).

2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, and (2) "special circumstances" warrant their release. *See, e.g., In re Extradition of Kirby*, 106 F.3d at 862-63; *Leitner*, 784 F.2d at 160-61; *In re Extradition of Antonowitz*, 244 F. Supp.3d 1066, 1068 (C.D. Cal. 2017); *In re Extradition of Mainero*, 950 F.Supp. 290, 294 (S.D. Cal. 1996). "This

---

[5] The government previously filed a Memorandum outlining the statutes and cases governing extradition proceedings. *See* ECF No. 5.

'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See*, *e.g.*, *Martinelli Berrocal*, 263 F. Supp.3d at 1304; *In re Extradition of Beresford-Redman*, 753 F. Supp.2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk). Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See*, *e.g.*, *In re Extradition of Perez-Cueva*, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016) (special circumstances must exist in addition to absence of risk of flight). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Salerno*, 878 F.2d at 317-18 (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *Mainero*, 950 F. Supp. at 294 (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see*, *e.g.*, *Kin-Hong*, 83 F.3d at 525;

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see*, *e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see*, *e.g.*, *In re Extradition of Noeller*, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-*

*Redman*, 753 F. Supp.2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see*, *e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see*, *e.g.*, *In re Extradition of Noeller*, 2017 WL 6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp.3d at 1301-02; *In re the Extradition of Kyung Joon Kim*, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see*, *e.g.*, *Antonowitz*, 244 F. Supp.3d at 1072; *Matter of Knotek*, 2016 WL 4726537, at *7; *In re Extradition of Orozco*, 268 F. Supp.2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see*, *e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see*, *e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see*, *e.g.*, *Salerno*, 878 F.2d at 318; *Antonowicz*, 244 F. Supp. 3d at 1070; and

- The availability of bail for the same offense in the requesting country, *see*, *e.g.*, *Antonowicz*, 244 F. Supp.3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

## B. Analysis

### 1. Saed is a Clear Flight Risk

The Court should detain Mr. Saed without bond because he is a flight risk. A fugitive charged with a crime in another country is already by definition in flight or deliberately absent from that jurisdiction. *Cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of

determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976)).

Additionally, the strength of Canada's case, the government's relatively low burden of proof in extradition hearings, and the prospect of serving a lengthy prison sentence, all provide Saed with a significant incentive to flee.  *See, e.g., In re Extradition of Adame*, 2013 WL 1222115, at *3 (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico"); *see also, e.g., In re Extradition of Shaw*, No. 14–MC–81475, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee.").  Accordingly, allowance of bail in any amount would not guarantee Mr. Saed's presence in Court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

The Pre-Bail Report supports the government's position on detention.  Mr. Saed is 25 years old, single with no children, and maintains no familial ties in the United States.  No suitable custodians have been identified.  With respect to sureties, Mr. Saed's half-brother in Canada is not suitable because, among other reasons, he resides outside the United States and beyond the jurisdiction of this Court. Moreover, Mr. Saed's roommate (Mr. Salinas), with whom Mr. Saed has lived with for approximately 18 months, and his friend (Mr. Segura), are only willing to sign unsecured bonds.  It is unclear how long they have known Mr. Said and whether they are aware of Mr. Saed's legal issues in Canada.  As a result of the foregoing, and in consideration of the presumption against bail in extradition cases, these individuals lack sufficient moral suasion over Mr. Saed to ensure his Court-mandated appearances and possible surrender for extradition.

Mr. Saed has demonstrated that he is a risk of flight based on his communications with Canadian authorities with respect to his criminal case there. Mr. Saed departed Canada on February 4, 2022, after his 2021 arrest and the searches of the stash houses in Vancouver. After investigators provided Mr. Saed with a copy of the charges, Mr. Saed communicated with investigators. During December 2022, Mr. Saed lulled the Canadian investigators by assuring them that he was wrapping up his affairs in the United States to return to Canada voluntarily and face the charges. Despite his promise to provide investigators with weekly updates on his return and Mr. Saed's apparent unemployment during 2023, Mr. Saed cut off contact with investigators and found new employment in the United States, refusing to return to Canada before his recent arrest.

2.    Saed is a Danger to the Community

In addition, the Court should detain Mr. Saed without bond because he is a danger to the community. Mr. Saed is wanted for prosecution on drug trafficking charges, where he is alleged to be part of a criminal organization that sold Schedule I hard drugs, including fentanyl, for cash and possessed firearms to protect the drugs and proceeds of drug sales. Photograph and video evidence depict Mr. Saed entering the stash houses with reusable shopping bags that were later analyzed and found to contain traces of fentanyl. Moreover, kilograms of fentanyl were seized from a stash house that Mr. Saed frequented and could access using the key fob he possessed. Another site Mr. Saed frequented had a semi-automatic rifle and ammunition. Given the inherent dangerousness of the alleged offenses, his release would pose a danger to the community here and abroad.

Mr. Saed's risk of flight and/or threat to the community is sufficient for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that he is not a danger to the community nor a flight risk, the government is unaware of any "special circumstances" that would justify bail in this case. Moreover, Mr. Saed has been aware of the warrant for his arrest and called Canadian investigators in December 2022 and informed them that he would return to Canada

voluntarily, but has refused to do so.  Should the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances."  Moreover, to protect the ability of the United States to meet its treaty obligations to Canada, the government requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

## III.    CONCLUSION

Mr. Saed has no significant ties to the District and remains a significant flight risk and danger to the community.  The facts and allegations discussed above, and Mr. Saed's actions after learning about the charges in Canada, demonstrate that Mr. Saed cannot overcome the presumption against bail in extradition matters.  For the foregoing reasons, the United States requests that Mr. Saed be detained pending resolution of this extradition proceeding.


Dated: February 12, 2024.                          Respectfully submitted,

                                                    ISMAIL J. RAMSEY
                                                    United States Attorney


                                                    */s/ Colin Sampson*
                                                    COLIN SAMPSON
                                                    Assistant United States Attorney