1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7   UNITED STATES OF AMERICA,                Case No. 4:24-mj-70178-MAG-1   (KAW)

8                         Plaintiff,         **ORDER CERTIFYING REQUEST FOR EXTRADITION**

9            v.                              Re: Dkt. Nos. 47, 49, 51

10  DIEGO SAED,

11                        Defendant.

12

13      In these proceedings, the government of Canada seeks the extradition of Diego Maradona

14  Haval Saed, a United States citizen.  Canadian authorities have charged him with eight offenses, of

15  which the United States is referring seven charges for extradition.

16      On June 13, 2024, the Court conducted an extradition hearing pursuant to 18 U.S.C. §

17  3184.  Having considered the evidence of criminality presented, for the reasons stated below, the

18  Court CERTIFIES to the United States Secretary of State that there is sufficient evidence to

19  sustain six of the seven of the referred charges against Saed under the governing extradition treaty.

20                            **I.    BACKGROUND**

21      **A.    Factual Background**

22      On February 1, 2024, a warrant for the arrest of Diego Maradona Haval Saed ("Saed") was

23  issued pursuant to a provisional arrest request from the Government of Canada under the authority

24  of its extradition treaty with the United States and 18 U.S.C. § 3184 et seq. (*See* Dkt. No.1.)

25      On February 2, 2024, the U.S. Marshals arrested Saed in this District, and Saed made an

26  initial court appearance on February 5, 2024. (Dkt. No. 6.)  Saed is currently in the custody of the

27  U.S. Marshals.

28      On March 27, 2024, the Government of Canada submitted a formal request, through the

United States District Court
Northern District of California

diplomatic channel, to extradite Saed to stand trial for seven offenses. (Extradition Req., Dkt. No. 44-2, SAED EXT 3-4.)[1]  The seven offenses are as follows: one count of Commission of an Offence for Criminal Organization, contrary to section 467.12(1) of the Criminal Code of Canada ("CCC"); one count of Conspiracy to Commit the Indictable Offence of Trafficking in Controlled Substances, contrary to section 465(1)(c) CCC; one count of Trafficking in Controlled Substances, contrary to section 5(1) of the Controlled Drugs and Substances Act ("CDSA"); three counts of Possession of Controlled Substances for the Purpose of Trafficking, contrary to section 5(2) of the CDSA; and one count of Possession of a Loaded Prohibited Firearm, contrary to section 95(1) of the CCC. SAED EXT 3 & 45.

Canada's extradition request presents the following facts related to the above charges. Canadian authorities investigated a drug trafficking organization ("DTO") known as the "Downtown Eastside Wolfpack." Extradition Req., SAED EXT 83-103 (Adzijaj Affidavit of Fact). They collected evidence from lawfully authorized police searches of drug stash sites (e.g., apartment units), in combination with police surveillance, CCTV footage, lawfully intercepted communications and expert evidence, showing that Saed committed drug trafficking offenses from approximately December 2020 to May 2021. SAED EXT 86-100.  In December 2020 and May 2021, during judicially-authorized searches, police found kilogram-level quantities of Schedule I drugs (i.e., carfentanil, fentanyl, methamphetamine, and cocaine), cash, and drug processing and trafficking paraphernalia (e.g., digital scale, Ziploc baggies, and cash counter machine) while searching drug stash sites located on Homer Street, Vancouver ("Homer"); Hornby Street, Vancouver ("Hornby"); Seymour Street, Vancouver ("Seymour"); and Alberni Street, Vancouver aka "Shangri-La" ("Alberni"). *Id.*

According to evidence from police surveillance, building CCTV footage and intercepted communications, Saed had access to the drug stash sites and attended them regularly, including the stash sites located on Hornby, Seymour, and Alberni Streets. SAED EXT 89-96. The same evidence showed Saed carrying bags in and out of the stash sites, and later conducting short-

_____

[1] For ease, this order will refer to the pages of the requests by Bates number (e.g. SAED EXT 1).

United States District Court
Northern District of California

duration meetings and bag exchanges with third parties in private locations, consistent with drug trafficking. *Id.* Evidence from audio and video probes inside Seymour and Alberni revealed Saed and other members of the DTO having conversations with others relating to the drug operation. SAED EXT 92 ¶ 34. Evidence from the video probe inside Seymour showed members of the DTO working together, in furtherance of the drug operation. SAED EXT 88-96. Saed was captured on video handling cash and bags of white powder. *Id.* at SAED EXT 93-95. A Canadian law enforcement drug expert concluded that the stash sites were used to prepare Schedule I drugs for the purpose of drug trafficking at the level of distribution and wholesale. *Id.* at SAED EXT 99-100 ¶¶ 50-53.

Based on evidence collected from lawfully authorized police searches of Seymour on May 31, 2021, Canadian authorities also believe that Saed possessed a prohibited firearm. SAED EXT 96-98 ¶¶ 40-45. Investigators found a .233 caliber Fabrique Nationale FNC Para semi-automatic assault rifle with a loaded magazine in the master bedroom at Seymour. SAED EXT 96. Saed was seen with a key entering Seymour regularly and had full care and control of the suite, and was seen entering and exiting the master bedroom four days before the search. SAED EXT 95 ¶ 37 & SAED EXT 97 ¶ 41. Law enforcement confirmed that Saed was not the holder of a license that would allow him to possess firearms. SAED EXT 99 ¶ 49.

On May 31, 2021, Canadian law enforcement located Saed, who, after leaving his personal residence, was in a taxi in Vancouver. SAED EXT 97-98. Vancouver police arrested Saed for trafficking in controlled substances offenses, among others, and conducted a search incident to arrest, finding Saed in possession of a key to Alberni. *Id.* Saed was released without charges or conditions later that same day. SAED EXT 98 ¶ 45. Canadian law enforcement identified Saed through police surveillance of the stash sites and video images of Saed inside a stash site, handling cash and putting substances into baggies and a police officer who personally knows Saed. SAED EXT 101.

Defendant remained in Vancouver for nine months following his release. (*See* Dkt. No. 10 at 3.)  In February 2022, Defendant moved to Napa, California, where he spent much of his childhood. *See id.* at 1.  On November 23, 2022, a warrant was issued for Defendant's arrest in the

United States District Court
Northern District of California

Province of British Columbia, Canada.  (Compl., Dkt. No. 1 ¶ 6.)  In December 2022, Defendant had contact with Canadian authorities investigating the drug trafficking case.  (Dkt. No. 9 at 9.) There was no further contact between Defendant and Canadian investigators in 2023. *See id.*  On June 2, 2023, Justice Kathleen M. Ker of the Supreme Court of the Province of British Columbia, Canada, issued a warrant for Defendant's arrest. *Id.* at 3.  Canada requested Defendant's provisional arrest pursuant to its extradition treaty with the United States. *Id.* at 1, n.1.

### B.    Procedural Background

On April 9, 2024, the United States filed a memorandum of law in support of extradition. (Mem., Dkt. No. 44.)  On May 21, 2024, Saed filed an opposition. (Opp'n, Dkt. No. 49.)  On May 30, 2024, the United States filed a reply. (Reply, Dkt. No. 51.)

## II.    LEGAL STANDARD

Extradition is a diplomatic process initiated by a request from the nation seeking extradition directly to the United States Department of State. "After the request has been evaluated by the State Department to determine whether it is within the scope of the relevant extradition treaty, a United States Attorney… files a complaint in federal district court seeking an arrest warrant for the person sought to be extradited." *Prasoprat v. Benov,* 421 F.3d 1009, 1012 (9th Cir. 2005) (citations and quotations omitted.)  18 U.S.C. § 3184 governs extradition from the United States to a foreign country.

If a foreign country files a sworn complaint charging an individual found within the jurisdiction, and if there is an extradition treaty or convention between the United States and the requesting foreign government, the judge must hold a hearing to determine whether "the crime is extraditable," and whether "there is probable cause to sustain the charge." *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008) (citations and internal quotations omitted).  Upon such a finding, the judge is required to certify the extradition to the Secretary of State. *Id.* at 1140.  The judicial officer "has no discretionary decision to make," for it is the executive branch, through the Secretary of State, that controls the ultimate decision regarding whether the charged individual should be surrendered to the requesting country. *Prasoprat,* 421 F.3d at 1012; *see* 18 U.S.C. §§ 3184, 3186.

### III.    DISCUSSION

The Court should certify a fugitive's extradition to the Secretary of State when the following requirements have been met: (a) the judicial officer is authorized to conduct the extradition proceeding; (b) the Court has jurisdiction over the fugitive; (c) the applicable extradition treaty is in full force and effect; (d) the crimes for which surrender is requested are covered by the treaty; and (e) there is sufficient evidence to support a finding of probable cause as to each charge. *See Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008).

The Court notes that Saed argues only that the United States has failed to establish that the dual criminality requirement is met for two of the seven Canadian counts for which it seeks extradition. (Opp'n at 1.)  Saed concedes that extradition is proper as to five the five drug counts. *Id.*  Thus, the only remaining issue is whether the two charges for Commission of an Offence for Criminal Organization, Possession of a Loaded Prohibited Firearm are covered by the treaty. *See* discussion, *infra,* Parts III.D-E.

### A.    Authority over the Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184.  The judicial officer conducting the extradition hearing prescribed by § 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (simplified). Both magistrate judges and district judges may render a certification under § 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993).  Here, Criminal Local Rule 7-1 expressly delegates to magistrate judges the authority to handle extradition matters. Crim. L.R. 7-1(b)(13) (N.D. Cal. 2024). Thus, the Court has authority over the instant proceedings.

### B.    Jurisdiction over the Fugitive

The Court has jurisdiction over a fugitive who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction ... issue his warrant for the apprehension of the person so charged.").  Saed

was arrested in Napa, California, which is located in this district.  Thus, the Court has jurisdiction over Saed.

### C.    Treaty in Full Force and Effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. 18 U.S.C. § 3184.  The State Department concluded that the extradition treaty between the United States and Canada is in full force and effect, and that it was most recently amended on April 30, 2003. (*See* Decl. of Tom Heinemann, ECF No. 44-2 ¶ 2, SAED EXT 0001.)  The State Department's conclusion that the Treaty is in full force and effect is entitled to deference. *See Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight"). Thus, the Court finds that the Treaty is in full force and effect.

### D.    Crimes Covered by Treaty

Extradition treaties create an obligation for the United States to surrender fugitives under particular circumstances. Article 1 of the applicable Treaty states that the United States and Canada agree to extradite to the other "persons found in its territory who have been charged with, or convicted of, any of the offenses covered by Article 2 of this Treaty". Treaty, SAED EXT 9 (art.1). Article 2 of the Treaty provides that "[e]xtradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment." SAED EXT 32 (art. 2(1)). It further provides, "[a]n offense is extraditable notwithstanding that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States…." SAED EXT 32 (art. 2(2)(i)). This is known as "dual criminality." *See United States v. Knotek*, 925 F.3d 1118, 1128–32 (9th Cir. 2019).

"Under the principles of dual criminality, no offense is extraditable unless it describes conduct which is criminal in both jurisdictions."  *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1404

United States District Court
Northern District of California

1    (9th Cir. 1988).  "To satisfy dual criminality, the name by which the crime is described in the two

2    countries need not be the same, nor does the scope of liability for the crime need to be the same.

3    Rather, dual criminality exists if the 'essential character' of the acts criminalized by the law of

4    each country are the same and if the laws are 'substantially analogous.'" *Id.* (internal quotation

5    omitted).  In turn, "[w]hen the laws of both the requesting and the requested party appear to be

6    directed to the same basic evil, the statutes are substantially analogous." *Choe v. Torres*, 525 F.3d

7    733, 738 (9th Cir. 2008).

8         While Saed does not dispute that dual criminality exists for the five drug charges, he

9    contends that the government has not shown dual criminality for the Canadian offenses of

10   Commission of an Offence for Criminal Organizations and Possession of a Loaded Prohibited

11   Firearm. (Opp'n at 4, 6.)  The Court will briefly address the drug charges and will then address the

12   two disputed offenses in more detail.

13              **i.    Drug offenses**

14        Saed is charged with one count of Conspiracy to Commit the Indictable Offence of

15   Trafficking in Controlled Substances, contrary to 465(1)(c) of the CCC. Request, SAED EXT 65.

16   Conspiracy to commit trafficking is "liable to the same punishment as that to which an accused

17   who is guilty of that offense would, on conviction, be liable." *Id.*  Under Canadian law, trafficking

18   offenses carry a potential penalty exceeding one year of imprisonment under Section 5(3) of the

19   CDSA, which provides a maximum penalty of life imprisonment for trafficking in controlled

20   substances and possession for the purpose of trafficking in controlled substances. SAED EXT 55,

21   57.

22        Saed is also charged with one count of Trafficking in Controlled Substances and three

23   counts of Possession of Controlled Substances for the Purpose of Trafficking, contrary to section

24   5(1) and 5(2) of the CDSA, respectively. SAED EXT 65-66. Here, Canada alleges that Saed

25   unlawfully trafficked in controlled substances (namely carfentanil, fentanyl, methamphetamine,

26   and cocaine) and possessed such controlled substances for the purposes of trafficking them on

27   multiple occasions between December 2020 and May 2021. *Id.*  As stated above, these trafficking

28   and possession offenses carry a potential penalty exceeding one year of imprisonment under

United States District Court
Northern District of California

7

Section 5(3) of the CDSA, which provides a maximum penalty of life imprisonment for trafficking in controlled substances and possession for the purpose of trafficking in controlled substances. SAED EXT 53-55.  The same alleged conduct, if committed in the United States, would be criminal and punishable by more than one year of imprisonment under statutes including 18 U.S.C. § 371 (conspiracy), 21 U.S.C § 841(a), and 21 U.S.C § 841(b)(1)(A)-(B) (trafficking in controlled substance.

Thus, the Court finds that the drug offenses satisfy the dual criminality requirement.

### ii.   Commission of an Offence for Criminal Organizations

This crime is defined as committing an indictable offense "for the benefit of, at the direction of, or in association with, a criminal organization." SAED EXT 56 (quoting Canada Criminal Code § 467.12(1)).  The elements of the offense "are that there is a criminal organization, and the various serious criminal activities and/or offences are connected to that criminal organization." SAED EXT 56. A "criminal organization" is a "group, however organized, that (a) is composed of three or more persons . . . and (b) has as one of its main purposes or main activities the facilitation or commission of one or more serious offences that, if committed, would likely result in the direct or indirect receipt of a material benefit, including a financial benefit, by the group or by any of the persons who constitute the group." SAED EXT 56 (quoting Criminal Code § 467.1(1)). "[S]erious offences" are those punishable by a maximum of at least five years. SAED EXT 56; *see also* Mem. 22 (discussing offense). For this charge, the indictment alleges that, between December 9, 2020, and May 31, 2021, Saed and four others unlawfully trafficked in carfentanil, fentanyl, methamphetamine, and/or cocaine "for the benefit of, at the direction of, or in association with a criminal organization composed of any three or more of" 15 named people (including Saed). SAED EXT 65 (Count 2).

Saed contends that the government fails to identity any United States offense that this specific conduct would violate. (Opp'n at 5.)  While the United States identified the federal conspiracy statute, 18 U.S.C. § 371, Saed claims that that is not sufficient under *United States v. Khan,* 993 F.2d 1368 (9th Cir. 1993), which he argues found that there was no dual criminality separate and apart from criminal conspiracy. (Opp'n at 6.)  Saed, however, appears to be

8

1    misinterpreting *Khan,* which found that there was no analogous crime in Pakistan for using a

2    telephone in the furtherance of a criminal conspiracy. *Khan*, 993 F.2d at 1373. There, the United

3    States did not seek extradition based on a charge of criminal conspiracy.  Thus, *Khan* does not

4    stand for the proposition that federal conspiracy cannot support dual criminality. *See id.* at 1373.

5    In response, the United States explains how Saed's alleged conduct falls within several

6    analogous statutes, including the federal conspiracy statute, that make drug manufacturing and

7    trafficking for a criminal organization a felony in the United States. (Resp. at 5-11.)  For example,

8    the federal drug trafficking conspiracy statute, 21 U.S.C. § 846, provides for a penalty equal to

9    that of the underlying offense. Here, under 18 U.S.C. § 841(b)(1)(A)(viii), Saed would face at

10   least 10 years imprisonment for the four kilograms of methamphetamine that he possessed on May

11   31, 2021. *See* SAED EXT 96 ¶ 39.  The elements of this violation are (1) two or more persons

12   agree to distribute or manufacture controlled substances; and (2) the defendant joined the

13   agreement knowing of its purpose and intending to help accomplish that purpose. Ninth Circuit

14   Model Criminal Jury Instruction 12.5 (2022).  Saed's agreement with others to manufacture and

15   sell illicit controlled substances would be a felony violation of this statute if committed in the

16   United States. *See id.* Moreover, as the United States argues, Saed has conceded to extradition on

17   all the drug related charges, including conspiracy to commit the Indictable Offense of Trafficking

18   in Controlled Substances offense, which is analogous to 21 U.S.C. § 846, so he has essentially

19   already conceded that there is dual criminality. (Reply at 8 (citing Opp'n at 6).)

20   Thus, the Court finds the dual criminality requirement satisfied for this count.

21         **iii.    Possession of a Loaded Prohibited Firearm**

22   The elements of the Canadian charge of Prohibited Firearm, in violation of the CCC

23   Section 95(1), are: (1) defendant possesses "in any place" a loaded prohibited firearm or restricted

24   firearm, or unloaded prohibited firearm or restricted firearm together with readily accessible

25   ammunition that is capable of being discharged in the firearm; (2) without being the holder of an

26   authorization or a license allowing him to possess it in that place and without the registration

27   certificate for the firearm. SAED EXT 58. Possession includes knowledge of the prohibited

28   firearm and an ability to control it or its presence. *Id.* at 57-58. Possession includes having a

United States District Court
Northern District of California

9

firearm in a place whether or not that place belongs to him or whether he occupies the place, where it is there for his use or benefit or for another's use or benefit. *Id.* at 54. Where several people possess a firearm, it is deemed to be within the custody and possession of each. *Id.* A prohibited firearm includes a list of firearms by characteristics. *See id.* at 58-59.

Saed argues that the Second Amendment protects him from having a loaded firearm with a 30-round loaded magazine without a license due to our "very strong Second Amendment protections." (Opp'n at 7.)  Saed further argues that the United States has not shown that possession of that particular firearm is prohibited, and that the government has not carried its burden of showing that his conduct would be punishable by more than one year of imprisonment. *Id.*

In response, the United States contends that the conduct underlying this charge violates several laws including illegal possession of an unregistered firearm (26 U.S.C. § 5861(d)), possession of a firearm in furtherance of drug trafficking crime (18 U.S.C. § 924(c)), and the California Ban on Assault Weapons (Cal. Penal Code §§ 30510, 30605(a), 30610). (Resp. at 12-14.)  To the extent that Saed argues that the California Ban is not a felony, because it's a "wobbler" offense, wobblers are presumptively considered felonies and remain felonies unless discretion is exercised to make them a misdemeanor. *United States v. Denton*, 611 F.3d 646, 651 (9th Cir. 2010).  Moreover, the Fabrique Nationale FNC firearm, which is what Saed allegedly possessed, is included in the California Ban. Cal. Penal Code § 30510(a)(7).  Thus, the California ban is considered a felony for the purposes of extradition.

The Second Amendment only protects the lawful possession of a firearm. *See District of Columbia v. Heller,* 554 U.S. 570, 635 (2008).  In *United States v. Potter,* the Ninth Circuit elaborated that *Heller* only protects the lawful possession and use of a firearm and "it cannot seriously be contended that the Second Amendment guarantees a right to use a firearm in furtherance of drug trafficking." 630 F.3d 1260, 1261 (9th Cir. 2011). "Clearly, the furtherance of drug trafficking is not a lawful purpose," and the Second Amendment is not a defense to possessing a firearm in furtherance of drug trafficking. *Id.* at 1261.  Thus, Saed's argument regarding Second Amendment protection fails, because possessing a firearm at a drug stash site

1    does not constitute a lawful purpose.

2    Finally, Saed argues that the Canadian possession charge has no analogue in United States

3    law, because under Canadian law mere knowledge of the firearm is sufficient even without the

4    ability to control it. (Opp'n at 10.)  According to the Affidavit of Law, possession under Canadian

5    Criminal Code § 95 requires that "the accused had knowledge of the prohibited firearm, and had

6    the ability to control it or its presence." Affidavit of Law, SAED EXT 0058 ¶ 51.  Similarly, the

7    Ninth Circuit considers "[a] person [to] ha[ve] possession of something if the person knows of its

8    presence and has physical control of it or knows of its presence and has the power and intention to

9    control it." Possession-Defined, Ninth Circuit Model Criminal Jury Instruction No. 6.5.

10   Additionally, "[m]ore than one person can be in possession of something if each knows of its

11   presence and has the power and intention to control it." *Id.*

12   Saed argues that the crimes must be strictly analogous, but they need only be "substantially

13   analogous" which allow for different scopes of liability. *Oen Yin-Choy*, 858 F.2d at 1404.  The

14   facts alleged consist of the firearm being found in the master bedroom of the Seymour stash house

15   when the search warrant was executed on May 31, 2021, and Saed "was observed to have a key

16   and had full care and control of this suite." Extradition Affidavit, SAED EXT 96 ¶ 40.  Whether or

17   not the evidence provided is sufficient goes more to probable cause than dual criminality, and the

18   Court will address those arguments below. *See* discussion, *infra,* Part III.E.iii.

19   Accordingly, the Court finds that the criminal statutes cited by the United States are

20   substantially analogous to Canadian Criminal Code § 95(1), and the dual criminality requirement

21   is satisfied for the firearms charge.

22   **E.   Probable Cause**

23   Finally, to certify the evidence to the Secretary of State, the Court must conclude there is

24   probable cause to believe that the crimes charged by Canada were committed by the person before

25   the Court. *See Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006).  The evidence is sufficient, and

26   probable cause is established, if it would cause a prudent person to "believ[e] that the [suspect]

27   had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). The

28   extradition judge's probable cause determination is "not a finding of fact 'in the sense that the

United States District Court
Northern District of California

11

court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

The government bears the burden of offering "evidence that 'will support a reasonable belief that [the extraditee] was guilty of the crime charged.' " *In re Extradition of Okeke*, 1996 WL 622213, *5 (D.N.J. Sept. 5, 1996) (quoting *Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir. 1990)). While "the government's evidence need only be properly authenticated" to be admitted, the Ninth Circuit has cautioned against "conflat[ing] the admissibility standard with the standard required to satisfy probable cause." *Santos v. Thomas*, 830 F.3d 987, 1006 (9th Cir. 2016). "Simply because evidence has been authenticated does not mean any evidence the government submits is sufficient to satisfy probable cause. Were that the case, the judiciary's role in the extradition process would be meaningless." *Id.* at 1006.  In assessing whether the government has met its burden, "[t]he credibility of witnesses and the weight accorded to their testimony is solely within the province of the extradition magistrate." *Quinn*, 783 F.3d at 815.

The Canadian government presented documentary evidence in support of extradition, including detailed affidavits from the Canadian prosecutors and investigators, outlining the evidence supporting each of the charges and the legal analysis for why that evidence satisfies the elements of the Canadian criminal provisions.

Saed does not dispute that probable cause exists for all of the referred charges. (*See* Opp'n at 1.)  Even so, the Court will now address the referred charges and make the requisite determinations regarding probable cause.

### i.   Drug offenses

#### a.   Conspiracy to Traffic in Controlled Substances

According to the Canadian prosecutor, a person is guilty under Section 465(1)(c) of the CCC if he "conspires with any one to commit an indictable offense." SAED EXT 57 ¶ 47. The elements of a conspiracy are defined as "an agreement by two or more persons to commit a criminal offense, or to achieve a lawful object by commission of a criminal offense." *Id.* at ¶ 48.

The United States contends that a finding of probable cause for conspiracy to traffic in controlled substance is supported by evidence from judicially authorized audio and video surveillance that captured detailed aspects of the Saed Group's drug trafficking operation. (Mem. at 24.)  The Court agrees.  Between January and May 2021, Saed was observed engaging in activities crucial to the operation's logistics, such as transporting drugs and cash between high-end condominiums used as stash sites. SAED EXT 86-100. The Seymour, Alberni, and Hornby stash sites, were under the control of the Saed group, as evidenced by judicially authorized surveillance that captured the preparation, packaging, and distribution of drugs, including cocaine, fentanyl, and methamphetamine. *Ids.* Video and audio surveillance document Saed's direct involvement through his attendance at key locations, participation in drug production and packaging activities, management of financial transactions, and engagement in strategic meetings regarding the drug trafficking operation. *Ids.* Covert audio and video probes within these stash sites captured conversations about drug production, distribution logistics, and financial transactions, alongside visible activities of drug packaging and cash handling. *Ids.*  Specifically, this included discussions regarding drug mixing ratios, delivery schedules, financial transactions, and the recruitment of workers for their distribution network. *Ids.*

As stated above, these observations were corroborated by the discovery of drugs, paraphernalia, and large sums of money during judicially authorized search warrants executed at high-rise apartment stash sites Seymour, Alberni, and Hornby. SAED EXT 90-100. The expert opinion provided by Detective Pat Murphy confirmed that the quantities and types of drugs seized were indicative of trafficking at a distribution and wholesale level. SAED EXT 99-100.

### b. Drug trafficking

According to Canadian authorities, a person violates Section 5(1) of the CDSA if he "traffics" a controlled substance listed in Schedule I, II, III, IV, or V. Paulsen Decl., SAED EXT 53 ¶ 24. Trafficking means selling, administering, giving, transferring, transporting, sending, or delivering, or offering to do any of the above, a controlled substance without legal authorization. SAED EXT 53 ¶ 26.

Here, the evidence presented by Canada establishes that Saed had access to drug stash sites

where police found kilogram-level quantities of Schedule I drugs—carfentanil, fentanyl, methamphetamine, and cocaine—alongside significant amounts of cash and paraphernalia used for drug processing and trafficking. SAED EXT 86-100.  Video surveillance and intercepted communications revealed that Saed accessed the drug stash sites frequently, carried bags in and out of stash sites, and engaged short meetings in private locations where he conducted bag exchanges with third parties. *Id.* at 89-99. Canadian investigators confirmed that these types of exchanges are consistent with drug trafficking. SAED EXT 88 ¶ 23.

       c. <u>Possession of Controlled Substances for the Purpose of Trafficking</u>

    A person violates Section 5(2) of the CDSA of Canada if he possesses a controlled substance listed in Schedule I, II, III, IV, or V. SAED EXT 53 ¶ 29. Possession means having some knowledge and some measure of control or right of control over the illegal substances alleged to be possessed. SAED EXT 54 ¶ 31. This includes having the substance in his personal possession, knowingly having the substance in the actual possession or custody of another person, or having the substance in any place, whether or not that place belongs to or is occupied by him, for the use of benefit of himself of another person. *Id.* at ¶ 32. Possession also includes where one or more persons, with the knowledge and consent of the rest, has anything in his custody or possession, it shall be deemed to be in the custody and possession of each and all of them. *Id.*

    The United States contends that the evidence presented by Canada establishes that, between March 19, 2021 and May 31, 2021, Saed possessed large quantities of a number of Schedule I drugs—namely, carfentanil, fentanyl, methamphetamine, and cocaine—for the purposes of trafficking; therefore providing ample support for three counts of possession of a controlled substance for the purpose of trafficking. (Mem. at 25.)  Indeed, video surveillance revealed that Saed personally carried bags in and out of stash sites. SAED EXT 89 ¶ 28. Specifically, on May 24, 2021, video footage captured Saed counting money and moving bags and a scale inside the Seymour stash site. SAED EXT 92 ¶ 35.  On May 25, 2021, Saed was again filmed at Seymour filling Ziploc bags with a white substance and placing some inside the crotch of his pants. SAED EXT 94 ¶ 36.  During the course of the investigation, Saed was observed at all stash sites. SAED EXT 96 ¶ 38.  When Saed was arrested on May 31, 2021, he was found to be in

possession of a key to the Alberni (aka Shangri-La) stash site. SAED EXT 98 ¶¶ 43-44. CCTV video and fob records show that Saed regularly attended Alberni and Seymour in the weeks leading up to his arrest. SAED EXT 92-100. When Canadian investigators executed search warrants on Alberni and Seymour on the day of Saed's arrest, they found kilogram-level quantities of cocaine, fentanyl, and methamphetamine. SAED EXT 96 ¶ 39.

Based on the foregoing, the Court finds there is probable cause for each of the five drug offenses.

### ii.    Criminal Organization

According to the Canadian prosecutor, a person is guilty under Section 467.12(1) of the CCC if: a criminal organization exists and the various serious criminal activities and/or offenses are connected to that organization. SAED EXT 56 ¶¶ 43-44. A criminal organization is defined as a group, however, organized, that is composed of "three or more persons in or outside of Canada" and "has as one of its main purposes or main activities the facilitation or commission of one or more serious offenses that, if committed, would likely result in the direct or indirect receipt of a material benefit, including a financial benefit, by the group or by any persons who constitute the group." *Id.* at ¶ 45.  Serious offenses are those with a maximum punishment of imprisonment for five years or more. *Id.* at ¶ 46.

Canada's investigation into the "Downtown Eastside Wolfpack," a faction of the "Wolf Pack"—a criminal network with origins in British Colombia and divisions across major Canadian cities—unveiled a highly structured criminal organization. SAED EXT 86-100. This group, later known as the "Saed Group," was led by Howjeen Saed, with Diego Saed identified as a member actively involved in its operations. SAED EXT 86 ¶ 13. From July 2020, the investigation focused on the group's involvement in the production and trafficking of controlled substances, notably cocaine and a uniquely colored fentanyl, dubbed "Purp," alongside carfentanil, heroin, and crystal methamphetamine. *Id.* at ¶¶ 13-14.

Saed's engagement in the organization was extensively documented through surveillance operations, which captured him attending all identified stash sites of the Saed group, transporting bags, and engaging in short-duration meetings indicative of drug trafficking activities. SAED EXT

87- 97. Judicial authorization granted on May 5, 2021, allowed for the installation of covert cameras and audio probes at these sites, revealing Saed's hands-on role in the drug operation. SAED EXT 89 ¶ 25. These devices recorded Saed handling significant sums of money and engaging in discussions directly related to the trafficking of drugs with co-accused members of the group. SAED EXT 92-100. He frequently carried bags in and out of stash sites and conducted short meetings where the bags were exchanged with other persons. *Id.* Furthermore, Saed was observed managing the logistics of the operation, including the storage, preparation, packaging, and transportation of drugs and cash. *Id.*

The execution of search warrants occurred at several stash sites where Saed was frequently seen accessing, resulted in the seizure of large quantities of drugs—cocaine, fentanyl, heroin, and methamphetamine—along with cash, drug paraphernalia, and materials used for drug cutting and packaging. SAED EXT 96 ¶ 39.  This evidence, corroborated by the expert opinion of a Canadian law enforcement drug specialist, confirmed the sites were utilized for the preparation of Schedule I drugs for trafficking at a distribution and wholesale level. SAED EXT 99-100.

Thus, the Court finds that there is probable cause for this charge.

### iii.    Possession of a Loaded Prohibited Firearm

Investigators seized a .223 caliber Fabrique Nationale FNC Para semi-automatic assault rifle during a search of the Seymour site on May 31, 2021. SAED EXT 96-97 ¶¶ 40-41. The firearm was identified by its serial number FN023795. SAED EXT 96 ¶ 40. It was concealed within a baseball bat bag in the master bedroom and had a loaded magazine beyond the legal capacity. *Id.* The CCTV and fob records document Saed's frequent visits to the Seymour site in the weeks leading to the execution of the search warrant. SAED EXT 97 ¶ 41.

On May 18, 2021, Saed was seen moving a bag from the Hornby stash site to Seymour. SAED EXT 97 ¶ 41. On May 20, 2021, Saed visited Seymour four times, entering and exiting with bags, a behavior that was replicated on May 24, 2021, during three separate visits. *Id.* On May 25, 2021, Saed made nine visits. *Id.* On May 26, 2021, Saed entered Seymour alone, using his key for entry, and removed bags from the suite. *Id.* Finally, on May 27, 2021, Saed was not only seen using a key for entry but was also observed removing cash from a backpack and

United States District Court
Northern District of California

16

counting it before taking it into the master bedroom where the firearm was located. *Id.* The United States argues that Saed's solitary visits to the stash site, his repeated and unaccompanied entries facilitated by a personal key, and his specific actions within the premises collectively establish his possession over the Seymour stash site and, consequently, the items within it. (Mem. at 27.)

While Saed did not explicitly challenge probable cause for this charge, he did argue that the government cannot show that his conduct constituted possession under United States law. (*See* Opp'n at 10.)  In finding dual criminality, the Court notes that criminal possession under both United States and Canadian law require that the accused have knowledge of the prohibited firearm and the ability to control it or its presence. *See* discussion, *supra,* Part III.D.iii.  Thus, a probable cause finding would require evidence to support that Saed had both knowledge and some degree of control over the firearm.

Saed argues that the firearm was concealed inside a baseball bat bag in the master bedroom at the Seymour stash house. (Opp'n at 10 (citing SAED EXT 96 ¶ 40.)  The affidavit concedes that it is unknown when the firearm was brought to Seymour and by whom, but it provides that Saed "was observed to have a key and had full care and control of this suite." SAED EXT 96 ¶ 40. Saed argues that there is no indication that the firearm was even present at the location when he last accessed the location, which was four days before the search. (Opp'n at 10.)  Saed further argues that there are no facts to suggest that he ever saw or was even aware of the firearm. *Id.*  The Court agrees.  In both the United States and Canada, possession requires knowledge and a degree of control.  While there is ample evidence of Saed handling large amounts of cash and drugs, there is nothing to suggest that he had any knowledge or control of the firearm or that the firearm was present when he last accessed the stash house.  Therefore, there is no probable cause for the possession charge, so Count 7 cannot be certified.

## IV.    CONCLUSION

For the reasons set forth above, pursuant to 18 U.S.C. § 3184, the Court CERTIFIES to the United States Secretary of State that Diego Maradona Haval Saed has been charged with crimes by the government of Canada, that six of the seven referred counts are extraditable offenses pursuant to the Treaty between the United States and Canada, and that sufficient evidence has

United States District Court
Northern District of California

17

been presented to sustain the charges under the provisions of that treaty.  In so doing, the Court specifically declines to certify Count 7 for Possession of a Loaded Prohibited Firearm in violation of Criminal Code § 95(1) due to the lack of probable cause.

IT IS SO ORDERED.

Dated: July 16, 2024

KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California